AUSA Sean Franzblau (312) 353-5305



FILED
7/24/2020 CC
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

**UNDER SEAL** 20 M 393

In the Matter of the Search of:

Case Number:

The iCloud Account for Apple ID
████████@sbcglobal.net, further described in
Attachment A

Magistrate Judge Jeffrey Cummings

# APPLICATION AND AFFIDAVIT FOR A SEARCH WARRANT

I, Gregory B. Linder, a Special Agent of the Federal Bureau of Investigation, request a search warrant and state under penalty of perjury that I have reason to believe that on the following property or premises:

### See Attachment A-II

located in the Northern District of Illinois, there is now concealed:

### See Attachment A-III

The basis for the search under Fed. R. Crim. P. 41(c) is evidence.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Sections 666(a)(1)(B), 666(a)(2), and 371 | Federal program bribery and conspiracy to commit federal program bribery |

The application is based on these facts:

### See Attached Affidavit.

Continued on the attached sheet.

_____
*Applicant's Signature*

GREG LINDER, Special Agent, Federal Bureau of
Investigation
*Printed name and title*

Sworn to before me and signed in my presence.

Date: July 24, 2020

_____
*Judge's signature*

City and State: Chicago, Illinois

JEFFREY I. CUMMINGS, U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT )
)
NORTHERN DISTRICT OF ILLINOIS )

## AFFIDAVIT

I, Gregory B. Linder, being duly sworn, state as follows:

1. I am a Special Agent with the Federal Bureau of Investigation. I have been so employed since approximately 2016. I am currently assigned to a public corruption squad, the primary purpose of which is to identify and investigate public corruption and bribery-related conduct by public officials. Through my training and experience, I am familiar with the techniques used to investigate such violations, including consensual monitoring, surveillance, data analysis, and interviewing witnesses and others who have knowledge of the corrupt activities. I have also participated in the execution of numerous federal search warrants.

2. This affidavit is made in support of an application for a warrant to search, pursuant to 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A), for information associated with a certain account that is stored at premises owned, maintained, controlled, or operated by Apple, Inc., which provided electronic mail and data services, located at One Infinite Loop, Cupertino, California 65014. The account to be searched is an Apple iCloud account associated with Apple ID ▮▮▮▮@sbcglobal.net, and with the associated DS ID ▮▮▮▮▮, used by ▮▮▮▮▮▮▮▮▮▮▮▮▮, described further in Attachment A (the "**Subject Account**"). As set forth below, there is probable cause to believe that the **Subject**

**Account** contains evidence of violations of 18 U.S.C. §§ 666(a)(1)(B) and 666(a)(2) and conspiracy to commit these offenses, in violation of 18 U.S.C. § 371("**the Subject Offenses**").

3.     The statements in this affidavit are based on my personal knowledge, and on information I have received from other persons with knowledge regarding relevant facts, including personnel with the City of Chicago Office of the Inspector General ("City OIG"), my review of bank records, property records, toll records, City of Chicago records, relevant press reports, relevant social media accounts, Apple Inc. business records, as well as my training and experience. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth facts that I believe are sufficient to establish probable cause to believe that evidence of the **Subject Offenses** are located within the **Subject Account**.

## SUMMARY

4.     The FBI is investigating allegations that in or around May 2019, ████████

████████████████████████████████████

████████████████████████████████████

████████████████████ As explained in detail below, according to ████████████████████████████████ in or around May 2019, shortly before ████████████████

2

accepted a $5,000 cash payment from ██████████████████████████████

██████████████████████████████████████████ Substantial evidence,

including statements made by ████████████████████████ presence, provide a

reasonable basis to believe that ████████████████████████ in exchange for

████████████████████████████████████████████

    5.    Specifically, in April 2019, shortly before ████████

████████████████████████████████████████████████████████████████

    6.    With this warrant, the FBI seeks authorization to search ████████

iCloud account to seize all text message communications between ████ and

████████ from February 2019 through the present that relate to the Project or

payments made from █████████████████ all other text message communications

from the same time period related to the development project and its developers, and

GPS information regarding ██████ physical location in May 2019, when ████ has

said that ███████████████████████████████████████████████████
█████████████████████████████████████

## FACTS ESTABLISHING PROBABLE CAUSE

### A.   Background on Apple and iCloud

7.    Based on my training and experience, I have learned the following
information about Apple and iCloud:

- Apple is a United States company that produces the iPhone, iPad, and iPod Touch, all of which use the iOS operating system, and desktop and laptop computers based on the Mac OS operating system.

- Apple provides a variety of services that can be accessed from Apple devices or, in some cases, other devices via web browsers or mobile and desktop applications ("apps"). These services include several forms of text messages, including iMessages (iPhone to iPhone text messaging), Short Messaging Service (SMS), and Multimedia Messaging Service (MMS). The services also include Location Services, which allows apps and websites to use information from cellular, Wi-Fi, Global Position System ("GPS") networks, and Bluetooth, to determine a user's approximate location.

- iCloud is a file hosting, storage, and sharing service provided by

4

Apple. iCloud can be utilized through numerous iCloud-connected services, and can also be used to store iOS device backups and data associated with third-party apps. iCloud backs up certain items stored on Apple devices linked to iCloud by automatically saving the items on separate servers controlled by Apple. Data that is automatically backed up and save to iCloud includes all text messages (iMessages, SMS, and MMS), Location Services data, photos, videos, application data, device settings, and other information. Thus, if an Apple device user deletes or otherwise loses data stored on an Apple device, the user can download the backed up files from iCloud.

- Apple provides users with five gigabytes of free electronic spaces on iCloud, and users can purchase additional storage space.

- Apple services are accessed through the use of an "Apple ID," an account created during the setup of an Apple device or through the iTunes or iCloud services. A single Apple ID can be linked to multiple Apple services and devices, serving as a central authentication and synching mechanism.

- An Apple ID initially takes the form of the full email address submitted by the user to create the account (the user can later customize the Apple ID). Users can submit an Apple-provided email address (often ending in @icloud.com, @me.com, or @mac.com) or an email address associated with a third-party email provider (such as Gmail, Yahoo, or Hotmail). The Apple ID can be used to access most Apple services (including iCloud, iMessage, and FaceTime) only after the user

accesses and responds to a "verification email" sent by Apple to that "primary" email address. Additional email addresses ("alternate," "rescue," and "notification" email addresses) can also be associated with an Apple ID by the user.

- Apple captures information associated with the creating and use of an Apple ID. During the creation of an Apple ID, the user must provide basic personal information including the user's full name, physical address, and telephone numbers. The user may also provide means of payment for products offered by Apple. In addition, Apple captures the date on which the account was created, the length of service, records of log-in times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), and whether the specific devices associated with the Apple ID are backed up to iCloud.

## B.  Background Information

8.  Based on my involvement in this investigation, including my review of Illinois State Board of Election records, ███████████ aldermanic website ████████████████████, relevant press reports, and interviews of individuals with knowledge, including members of the City OIG, I know that ████████████

████████████████████████████████

████████████████████████████████ is currently serving a four-year term. ████████████████ ████████████████████████████ has no known criminal history.

9.     Based on my review of City of Chicago records, relevant press reports, and discussions with City OIG personnel with knowledge, I know that Alderman 1 was the ██████████████████████████████████████ Alderman 1 lost to ████████████████████████████ aldermanic election. In late 2018 and early 2019,

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

10.     The Project involved two private real estate development companies, Development Companies 1 and 2, that sought to build a ███████████████████ with roughly 24,000 square feet of retail space on the first floor (to be occupied by an

████████████████████████████████████████████████████████████

██████████████████████████████     Developer 1 is a founding principal of Development Company 1, and was Development Company 1's lead representative on the Project.     Developer 2 is an owner of Development Company 2, and was Development Company 2's lead representative on the Project.     Development Company 1/Developer 1 were generally responsible for the ████ aspects of the Project, and Development Company 2/Developer 2 were responsible for the ████ part of the Project.

11.     The Chicago Plan Commission is a branch of the City of Chicago's municipal government responsible for reviewing planned development proposals (such as the Project) within the City of Chicago. The Plan Commission is made up of 23 members including the mayor, several alderman, the commissioners of several municipal agencies, and approximately 10 members appointed by the mayor with the City Council's consent. If the Plan Commission approves a planned development project, the project proposal is sent to the City Council for consideration. On or about ██████████████ the Plan Commission unanimously approved the proposal for the Project.

12.     The Chicago City Council has a Committee on Zoning, Landmarks, and

8

Building Standards (the "Zoning Committee") that has jurisdiction over all zoning matters and land use policy generally. Based on my discussions with City OIG personnel with knowledge, I know that the Zoning Committee follows a general practice in which the chairman/woman of the committee will not put a proposed zoning ordinance to a vote unless the alderperson of the affected ward supports the proposed ordinance. This practice of giving aldermen effective veto power over issues in their respective wards is known as "aldermanic prerogative."

13. After the Plan Commission unanimously approved the Project proposal on ████████ the Zoning Committee scheduled a hearing for ████████ at which to consider the necessary zoning ordinances for the Project. Based on a review of publicly available Chicago City Council records and contemporaneous news media accounts, ████████████████████████████████

████████████████████████████████

15.　Based on information from the Illinois Secretary of State and publicly available information, I know that ███████ is the owner of numerous businesses, including ████████████████████████████████████████████████████ located at ███████████████████████████████████████████████████ resides in Arlington Heights, Illinois. ███████ has no known criminal history.

16.　Based on my review of press reports and conversations with City OIG personnel with knowledge, I know that in or around ███████████ the City of Chicago's Board of Ethics found that ██████ had violated City campaign finance laws by donating several thousand dollars over the allowable limit to Alderman 1. The ordinance in question limited individuals and businesses who contracted with the City to giving no more than $1,500 to any single candidate in a given year. At the time, several of ██████ businesses had contracts with the City. The Board of Ethics determined that, while these City contracts were in place, ██████ unlawfully donated ██████ to Alderman 1 in a single year—██████ over the allowable annual limit. According to press reports, ██████ claimed he had been unaware of the ordinance,

which went into effect in 2012. The Board of Ethics declined to fine ███ [2]

17.    Under Illinois law, political committees (including campaigns) are required to file accurate quarterly reports ("D-2 Reports") with the Illinois State Board of Elections listing financial activity over $150, including campaign contributions and expenditures. Based on my review of D-2 Reports for ███ s aldermanic campaign committee, ██████████ did not report any contributions from █████████ known businesses in 2019. ███ reported a $1,500 contribution from ████ on January 21, 2020 (which is the maximum amount ███ could lawfully give to ███ in one year, as ███ continued to hold City contracts in 2020).

18.    Based on my review of usaspending.gov, in fiscal year 2019, the City of Chicago received hundreds of millions of dollars in federal benefits, including over $125 million from the U.S. Department of Education for the Head Start and Early Head Start programs.[3]

C.    **Information from CS-1**

19.    In or around March 2020, the FBI developed a confidential source (CS-

---

[2] I include this information in part to corroborate that ███ had a relationship with Alderman 1. As explained below at paragraph 22, according to CS-1, in May 2019, ███ told CS-1 and ███ that he wanted the ████████████ ██████

[3] Pursuant to 18 U.S.C. § 666(b), this means that the federal government has jurisdiction to prosecute bribery offenses involving agents of the City of Chicago committed within any one year period of the time the federal benefits were received.

1) who served as ██████████████████████████ from approximately November 2018 until February 2019, and as ████████████████ from approximately May 2019 to November 2019.[4] CS-1 left ██████████████ in November 2019.

20.     According to CS-1, on or about April 25, 2019, weeks before ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ called CS-1 and stated that he ▮▮▮▮▮▮ had caused the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Specifically, ▮▮▮▮▮▮▮▮ explained that he had obtained a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Staffer 1, onto ▮▮▮▮▮▮▮▮ taff after Alderman 2 retired.[6] ▮▮▮▮▮▮▮ told CS-1 that, to

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[5] Toll records generally confirm that ▮▮▮▮▮▮▮▮ and CS-1 had phone contact on April 25, 2019.

[6] Based on City OIG records, Staffer 1 has been employed by the City of Chicago since ▮▮▮▮ and in ▮▮▮▮▮▮ was appointed to a new position. While the records do not specify the office or department in which Staffer 1 has worked, the records are consistent with Staffer 1 working for ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ for approximately 15 years, and then being hired by ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ when ▮▮▮▮▮▮▮ entered office.

13

block the Project, ████████ had ███████████████████████ who was then a member of the ████████████████████ set to vote on whether to approve the

████████████████████████████████████████████████████████

████████████████████████████████████████ ███████████ told CS-1 that ███████ ███████████████████████████████████████████

████████████████████████████████████████████████████████

told CS-1 that, as directed, Alderman 3 ██████████████████ and there ████████████████████████████████████████████ approval did not go forward. ████████ did not explain to CS-1 during this call why he had wanted to block the Project.[7]

21.     According to CS-1, on or about May 7, 2019—approximately two weeks after the phone call in which ███████ stated he had ███████ (and still shortly before ████████████████████)—CS-1 met with ████████ at a Chicago fire station where ██████████████████████████████ ████████████████████████ During the meeting, ███████ introduced CS-1 to ████████ told ████████ and CS-1 that Alderman 1, the ████████ Ward Alderman whom ████████ was replacing, had ███████ ███████ in connection with the Project. Specifically, ███████ tated that in or around 2013, ████████ nd one of the developers behind the Project were in negotiations for the

―――――――――
[7] This information is corroborated by the independent evidence discussed above at paragraphs 13 and 14.

developer to develop a ████████████████████████████████████.[8] ███

further stated that, due to a falling out that ████ had with Alderman 1 around this

time, Alderman 1 convinced the developer to build the ████████ at the ███

████████ as part of the Project), instead of on ████ property.[9] ████ stated

that he had invested over $20,000 in developing his property in anticipation of the

developer building senior living units on it, and had lost all of that money. ████

told ████ and CS-1 that he was angry with Alderman 1 and the developers

behind the Project, and wanted to get back at them. During the meeting, ████ did

not ask ████████ for help in getting back at Alderman 1 or Development

Companies 1 and 2 in CS-1's presence, nor did ████████ mention to ████ in CS-

1's presence that ████████ had caused Alderman 3 to effectively block the Project

from going forward ████████████████.

    22.    According to CS-1, immediately after ████ left the meeting at the fire

---

[8] CS-1 stated that s/he believed ████ stated at the May 7, 2019 meeting that it was
Developer 1 who ████ had planned to work with to build ████████████████
property. I believe CS-1 is mistaken on this point. Based on my involvement in this
investigation, I know that Development Company 2/Developer 2 specialized in ████████
developments, and were responsible for the ████████ aspect of the Project. Further, the
information in paragraphs 38 and 39 show that Developer 2 and ████ had a prior
relationship. Therefore, I believe it is more likely that ████ had previously been in talks
with Development Company 2/Developer 2 to build senior living units on ████ property.
However, when ████ spoke to CS-1 on or about May 7, 2019, Developer 1 and Developer 2
had already partnered on the Project, so it would not be surprising if ████ mentioned
Developer 1 during the meeting when discussing the Project generally.

[9] As explained above at paragraph 12, in ████████ the City's Board of Ethics made a
public finding that ████ had exceeded allowable contribution limits to Alderman 1 by
several thousand dollars. Alderman 1 ultimately returned the improper contributions to
████ following an investigation.

station, ██████████ asked CS-1 what s/he thought of █████ CS-1 told ████████

that s/he thought █████ was a "shyster" and that ██████████ should avoid █████

██████████ replied with words to the effect of, ██████ has a lot of money, and he's

going to be a good friend once I'm in office."

23.     According to CS-1, around this same time, ██████████ was in the

process of moving into his new ████████████ ██████████ did not like the

windows in the office and wanted to replace them. ██████████ obtained cost

estimates on the window replacement job, including an estimate from a business CS-

1 recommended to ████████, which quoted the cost at approximately $16,000. CS-

1 advised ██████████ that the City of Chicago would not cover such an expense, and

██████████ told CS-1 that ████████████████████████████████████████

24.     According to CS-1, on a Saturday shortly after s/he met █████ which

CS-1 believed was either May 11 or May 18, 2019 (CS-1 is certain it was a Saturday,

but could not recall if it was the first or second Saturday after s/he met ██████

██████████ nd CS-1 were set to meet with the owners of the building in which

██████████████████████ is located, Individuals A and B, who, according to CS-

1, operate a real estate business together ("Company A"). The meeting was scheduled

for 10:00 a.m. at Company A's office located at ██████████████ Ave., next door to

██████████████████████ office. At approximately 9:45 a.m., as CS-1 was walking

into the ██████ office, CS-1 saw ██████████ sitting in the front passenger seat

of a black Mercedes Benz vehicle, and saw █████ sitting in the driver's seat. The

16

front passenger door was open and CS-1, who was standing approximately 10 feet away, could see into the car. CS-1 saw ████ remove a yellow envelope from the vehicle's center console and hand it to ████ CS-1 then saw ████ "fist bump" ████ then walked into the ████ office carrying the yellow envelope.

25. According to June 2020 Illinois Department of Motor Vehicles records, since January 2018, a 2018 black Mercedes Benz sedan has been registered to ████ ████ home address. According to Illinois Secretary of State records, ████

26. According to CS-1, approximately 10-15 minutes later ████ CS-1, and another ████ employee, Individual C, walked over to the property owners' office together from the ████ office. ████ carried the yellow envelope he had just received from ████ with him. ████ CS-1, and Individual C then met with Individuals A and B and discussed several issues, including the monthly rent amount and the replacement of the windows. Toward the end of the meeting, ████ pulled out the yellow envelope, which was unsealed, from his pocket and handed it to one of the property owners. ████ told Individuals A and B it was a "down payment" for the window replacement. CS-1 could see that the envelope was full of cash. Individual A removed the cash from the envelope and counted it in front of ████ and CS-1.

27. According to CS-1, the cash totaled $5,000 and was in denominations of

17

$100 and $20 bills.[10] Individual A told ███████ that s/he was a certified public accountant and needed to log the money "in the books." ███████ responded with words to the effect of, "You don't need to do that," but Individual A insisted. CS-1 stated that Individual A should indeed make a record of the payment in Company A's records, at which point ███████ kicked CS-1 under the table, which CS-1 understood as a direction to be quiet. ███████ appeared to be upset. Shortly thereafter, ███████ and CS-1 returned to the aldermanic office. During the walk back, ███████ and CS-1 got into an argument over the recording of the payment, and ███████ accused CS-1 of "taking sides" with the property owners.

28. According to CS-1, at some point over the next several days, CS-1 met with ███████ at a Starbucks café. ███████ apologized to CS-1 for getting upset with him/her over Individual A's documentation of the $5,000 payment. During the meeting, CS-1, who was in charge of maintaining a financial spreadsheet that tracked all campaign contributions and expenditures, and which ███████ sent to an outside accountant to create his ███ Reports, asked ███████ if he was going to record the $5,000 contribution from ███████ and associated expenditure to Individuals A and B. ███████ responded that he was not going to report any of the payments because ███████ had instructed him not to.

29. According to CS-1, after this meeting, ███████ never spoke to CS-1

---

[10] As explained below at paragraph 35, the $5,000 payment is corroborated by bank records.

again about ▮▮▮. However, on at least one other occasion in the weeks following the meeting with Individuals A and B on May 11 or 18, 2019, CS-1 saw ▮▮▮ leave his ▮▮▮ office to meet privately with ▮▮▮ in a black Mercedes Benz sedan just outside the office, and return to the office a few minutes later carrying a yellow envelope that looked similar to the envelope CS-1 saw ▮▮▮ hand to ▮▮▮ on or about May 11 or 18, 2019. CS-1 did not see the contents of this second envelope, but saw that it had a rectangular bulge shape that was consistent with a stack of cash.

30.    According to CS-1, during late May and early June 2019, a private company replaced the windows at ▮▮▮ office. CS-1 did not recall the name of the company, but did not believe it was owned by ▮▮▮. On or about June 26, 2020, CS-1 forwarded me several images that, according to CS-1, s/he received from ▮▮▮ during the time the windows were being replaced.[11] Based on information received from CS-1, and consistent with my review, the images depicted the following: (a) three images depicted the old windows installed in ▮▮▮ office with two sample window frames; (b) three images depicted construction/renovation activity taking place inside ▮▮▮

---

[11] Toll records show that ▮▮▮ sent CS-1 dozens of MMS messages in the approximately three-week period after May 13, 2019 (when, as explained below at paragraph 32, the City issued a building permit authorizing renovations to ▮▮▮ office), which is consistent with ▮▮▮ sending CS-1 photographs of the renovations during this time period.

████████ office, including flooring, paint, and drywall work; two images depicted brown paper taped to the front door and windows of ████████ ████ office; one image depicted numerous pieces of wood and drywall removed from inside ████████████ office; and (c) one image depicted one of the new windows installed on the building with the reflection on the window showing a window truck and ████████ himself, who appeared to be taking the image on a cell phone. An additional image provided by CS-1, who received it from ████████ depicted a business card for Company B and listed Individual B as "General Manager." The address listed on the business card was ████████████ Ave, Chicago, IL 60630," the same office as Company A (next door to ████████████ office).

31. According to City of Chicago records, a building permit to replace the windows at ████████ aldermanic office was issued on May 13, 2019. I have reviewed ████████'s aldermanic expense account for 2019 (which is available was provided to me by the City OIG) and there do not appear to be any record of payments to any window or glass company from the ████████ account.[12] I have also reviewed ████████████ reports for 2019 and there does not appear to be any record of payment from ████████████ to a window or glass company.

---

[12] City of Chicago Alderman receive an annual public stipend to cover basic aldermanic expenses, such as office rent, lease vehicles, pay utility bills, and hire part-time staffers. In 2019, the annual stipend was $97,000.

## D. Toll, Bank, Property, and Secretary of State Records Generally Corroborate CS-1

32. CS-1 reported that ▆▆▆▆▆▆▆▆▆▆▆ regularly communicated via text message. CS-1 reported that ▆▆▆▆ used telephone number (773) ▆▆▆▆ and ▆▆▆ used telephone number (773) ▆▆▆▆ CS-1 reported that s/he knew ▆▆▆ used the #5649 phone number because ▆▆▆▆▆ had provided to CS-1 ▆▆▆s contact information for the purpose of potentially scheduling meetings between ▆▆▆▆▆ and ▆▆▆; however, CS-1 never contacted ▆▆▆ Subpoenaed records from AT&T and Verizon Wireless confirm that ▆▆▆▆▆▆ is the registered subscriber for telephone number (773) ▆▆▆ According to subpoenaed records from Verizon Wireless, ▆▆▆▆▆▆▆ Company ▆▆▆▆ business) is the registered subscriber for telephone number (773) ▆▆▆▆

33. According to the toll records, beginning February 26, 2019 and ending April 13, 2020, ▆▆▆▆▆▆▆▆▆▆ exchanged approximately 300 text messages. ▆▆▆▆▆▆▆▆▆▆ exchanged approximately 96 of these 300 text messages in May 2019 alone. ▆▆▆▆▆▆▆▆▆ exchanged approximately 51 of the 96 May 2019 text messages between May 17 and 20, 2019. Between February 26, 2019 and April 13, 2020, ▆▆▆▆▆▆▆▆ had their second highest level of phone contact (i.e. text messages and calls) on May 18, 2019 (17 text messages, 0 phone calls)—which is one of the two possible Saturdays (the other being May 11, 2019) that

21

CS-1 identified as the date on which ████████████████ the $5,000. The only

day with more phone contacts was May 9, 2019 (21 text messages and 9 phone calls).

████████████████ had no phone contacts on May 11, 2019.

34.    Illinois Secretary of State records show that Individual A is the

registered president and agent of Company A. Subpoena returns from J.P. Morgan

Chase Bank show that on May 18, 2019, Individuals A and B opened a new business

account in the name of Company A and made a $5,000 cash deposit. According to

publicly available records on the Cook County Recorder of Deeds website, on or about

December 13, 2018, Individuals A and B were granted a warranty deed to ████████

████████Ave., the building in which ████████████████ office is located, and

continue to own the building as of June 2020. According to Illinois Secretary of State

Records, Individual B is the president of Company B, and Individual A is the

Secretary (see paragraph 29). Because this investigation remains in a covert phase, I

have not yet interviewed Individuals A, B, or C to corroborate the information

provided by CS-1.

35.    Based on information from the City OIG, as well as my review of Cook

County Recorder of Deeds records, I know that since at least 2018, ████ has owned

a stretch of commercial properties and lots that spanned from approximately ████

████████Ave to at least ████████████Ave, including two vacant lots at the

northeast and southeast corners of ████████████████████████

properties are approximately 1 mile northwest of the six-corners site. On or about

22

July 11, 2020, an FBI agent assigned to this investigation drove past ███████ ██ properties on ████████ Ave. and observed a sign posted on the ███████████ lot. Based on the sign (a photograph of which is included below), it appears that ███████ is actively trying to sell and develop the site at ████████████████ Based on CS-1's information, as well as the size of the █████████████ lot and its proximity to the ████████ site, I believe this is likely the lot that ████████ sought to sell to Developer 1 or 2 in or around 2013. However, I have not been able to confirm through public source information whether Developer 1 or 2 ever considered building ████████ ████ units on any of ██████ properties/lots. Due to the current covert phase of the investigation I have not attempted to interview either developer to confirm CS-1's information. However, as explained below at paragraph 39, independent evidence shows that ████████ and Developer 2 had a prior relationship prior to August 2019 that appears to have been related in some way to the Project.



### E. ▮▮▮▮▮▮▮▮ **Formally Opposed the** ▮▮▮▮▮▮▮▮▮▮▮▮ **and Indicated to CS-1 His Motive Was To** ▮▮▮▮▮▮▮▮▮▮

36.     According to CS-1, after ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ in May 2019, ▮▮▮▮▮▮▮ went door-to-door canvassing his constituents and held several public meetings regarding the Project in an apparent effort to form an official position as to whether or not he would support it. According to CS-1 (who attended several of ▮▮▮▮▮▮▮ meetings with constituents to discuss the Project), CS-1 perceived that there was strong majority support for the project among ▮▮▮▮▮▮▮ constituents. Specifically, CS-1 estimated that 80 percent of ward residents supported the Project, and 20 percent opposed it.

24

37.     According to CS-1, despite the strong public support for the Project,

▇▇▇▇▇▇ made statements to CS-1 in August and September 2019 that led CS-1

to believe that ▇▇▇▇▇ was going to oppose the Project ▇▇▇▇▇▇▇▇ For

example, on or about July 15, 2020, CS-1 sent me the below screenshot of an August

29, 2019 text message conversation that s/he had with ▇▇▇▇▇ (I have reviewed

▇▇▇▇▇ toll records for August 29, 2019 and they appear to align with the text

messages depicted in the screenshot). ▇▇▇▇▇ statements appear on the left

side of the screenshot, and CS-1's are on the right:



38.     At the beginning of the message, ▇▇▇▇▇ forwards a voicemail

communication to CS-1. CS-1 also sent me a copy of what s/he stated was the voicemail recording included in the message. Based on my review of this recording, the voicemail appears to be a call from Developer 2 to █████████ in which Developer 2 states[13]:

> ████ good morning, it's [Developer 2] from [Development Company 2]. Uh, we spoke probably, you know, three or four months ago regarding our project, um, our proposed project at six corners, and I wanted to, trying to let you know there's going to be a community meeting coming up September 17th, and I wanted to speak to you in advance, hopefully speak to you today or tomorrow. I'm going to be out of the country for a couple of weeks, um, so if I can connect with you ahead of that I would appreciate it. My phone number, again my cell phone is [(XXX) XXX-] 7830 and my office line is [(XXX) XXX-] 1160, thanks."

39.    According to CS-1, when s/he first received the voicemail from ██████████ and read the first two messages ("Well, well, well"; "Its on"), s/he did not understand what █████████ was communicating to him/her, and asked if the voicemail referred to a different "Alex"(different from ███████. According to CS-1, after ██████████ clarified that the message was to "Alex Windows," s/he understood ██████████ was referring to ████████████████████████████ ██████ According to CS-1, once s/he understood the message involved ████ and the ███████████████████████████, by "Well, well, well" and "its on," CS-1 understood ██████████ to be saying he was going to "fuck with" the Project—

---

[13] I have compared the voice on this message to Developer 2's voice from a recorded public meeting at which Developer 2 spoke (see paragraph 45) and the voices appear to be the same. Further, based on my review of Development Company 2's website, the phone number listed for Developer 2 on the website is the same number that the speaker on the voicemail message gives for his office line.

meaning, essentially, unnecessarily delay it to inflict costs on the developers—as a favor to ▮▮▮ (who, as explained above at paragraph 22, in May 2019, told CS-1 and ▮▮▮▮ that a developer behind the Project had "screwed" ▮▮▮ by deciding to build the senior living units at the ▮▮▮▮ as part of the Project rather than on ▮▮▮ property, and that ▮▮▮ wanted to get back at the developer).

40. Based on toll records, on August 29, 2019, at 12:01 p.m., ▮▮▮ received an incoming phone call from the 1160 number (Developer 2's office line), consistent with Developer 2 leaving a voicemail for ▮▮▮ One minute later, at 12:02 p.m., ▮▮▮▮▮ an MMS message, consistent with ▮▮▮ forwarding to ▮▮▮ the voicemail messag▮▮ had just received from Developer 2.

41. Based on press reporting and information received from CS-1 (and further corroborated by Developer 2's voicemail), on or about ▮▮▮▮ in the lead up to ▮▮▮ announcing whether or not he would support the Project, ▮▮▮ held a public meeting on the Project at the ▮▮▮▮ in Chicago. According to CS-1, prior to the meeting, ▮▮▮ explained to CS-1 that he had arranged for several of his friends and political supporters, including Individual D, to attend the meeting and voice opposition to the project. ▮▮▮ told CS-1 that he had to make it appear as though there was more public opposition to the Project than there actually was. According to CS-1, s/he understood from this statement (and the later statement discussed below at paragraph 51) that

27

████████████ planned to oppose the Project as a favor to ████ but wanted to make it appear as though he was responding to the concerns of his constituents. According to CS-1, ████████ also stated that he wanted to try to embarrass ████████ and Developer 1 at the meeting by having Individual D point out that Developer 1 had previously donated to ████████ but that ████████ had never accepted a political donation from Developer 1. Additionally and also according to CS-1, ████████ asked Individual D to ask the Developers if there had been a previous location for the Project (prior to the ████████████ location) as a means to call to attention that the Developers initially considered ████ property as a proposed development site.

42. I have reviewed what purports to be a video recording of the ████████ ████ meeting that is publicly available on the Facebook page of the ████ Association, which, according to its website, is a nonprofit economic development association located on Chicago's northwest side.[14] CS-1 has confirmed the authenticity of the video. Based on my review, the video depicts ████████

████████████████████████████████████████████████████

---

[14] A link to the video is here: ████████████████████████████████████████

43.     At the beginning of the meeting, Developer 1 stated that, after the Plan

Commission unanimously approved the Project proposal in ███████████

████████████████████████████████████████████████████

44.     After Developer 1's remarks, Developer 2 and the representatives from

the ████████████ corporation and ████ spent about 25 minutes walking the

audience through the plan. Next, ████████ Developers 1 and 2, and the ████

████ facility and ████ representative took questions from the audience for

approximately 2 hours. Based on my review of the video, the following media report

of the event, which was published by ████████████████ an online, nonprofit news

media source that reports on local Chicago neighborhood happenings, accurately

summarizes what occurred at the meeting:



45.     Based on my review of the video, during the question and answer session (at approximately the 1:25:48 mark), an adult male who identified himself as [Individual D] directed several questions at Developer 1, including the following:

- 

46.     In response to the question of whether Developer 1 had previously considered other sites for the Project, Developer 1 responded that he did not know what Individual D was referring to. Individual D then interjected and said, "By the

fire department up on Milwaukee." I believe this was a reference to ███████ property at ███████████████████ which, as explained above at paragraph 36, is approximately 1 mile from the ███████████ and which is also situated directly next to a Chicago Fire Department station. In response to Individual D's clarification, Developer 1 stated, "I think it's time to move on [to the next question]." Developer 1 then stated, "I did not donate thousands of dollars to [Alderman 1], and I have not donated a single dime to ████████████████████

47. ████████ then stated, "██████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████ comment drew applause from the audience. At the end of the meeting, ███████████ stated he would announce his formal position on the Project within two weeks.

48. Based on toll records, ████████████████████ exchanged at least two text message communications immediately after the ████████████████ meeting (at 10:23 p.m. and 11:25 p.m.), which was the first phone contact they had had since August 29, 2019.

49. According to CS-1, on or about Friday, ████████ 2019, in the evening, ███████████ nd CS-1 were set to have a private meeting with Developer 1 that Developer 1 cancelled at the last minute. According to CS-1 ███████████ was

upset by the last minute cancellation. According to CS-1, shortly after Developer 1 cancelled the meeting, ▮▮▮▮▮ asked CS-1 and two other staff members to assemble in a conference room. ▮▮▮▮▮ told the staffers that he had decided to formally announce his opposition to the Project, and wanted his staffers to draft a statement ▮▮▮▮▮ that explained that ▮▮▮▮▮ opposition was based on feedback he had received from the public. According to CS-1, s/he and the two other staff members pushed back on ▮▮▮▮▮ saying that they could not draft a credible statement that ▮▮▮▮▮ was opposing the Project based on public feedback since the majority of ▮▮▮▮▮ were obviously and strongly in support of the Project. According to CS-1, ▮▮▮▮▮ insisted that they draft the statement.

50.    According to CS-1, shortly after this, CS-1 returned to his/her office to work on the statement. According to CS-1, as s/he was drafting the statement, ▮▮▮▮▮ came into his/her office and stated words to the effect of, "[Developer 1] likes tying up ▮▮ money, let's see how he likes it done to him." According to CS-1, s/he understood ▮▮▮▮▮ to be saying that he was opposing the Project to inflict unnecessary costs on Developer 1, as a means of retaliating against Developer 1 on ▮▮▮▮▮ behalf.

51.    Based on toll records, ▮▮▮▮▮ exchanged 14 text messages on Monday, ▮▮▮▮▮ 2019 (the Monday before ▮▮▮▮▮ formally announced his opposition to the Project on Friday, ▮▮▮▮▮ 2019). This was the

32

most telephone contact that ███████████████ had in the one-year period between July 10, 2019 and the present. Between September 24, 2019 and October 3, 2019, ███████████████ had no phone contact. Based on my training and experience, I know that it is common for elected officials to publicly announce their decisions on controversial issues the Friday evening after the decision is made, to avoid coverage during the weekday news cycle (when (at least the theory goes) more people are paying attention).

52.     On or about July 10, 2020, I reviewed ███████████████ ███████████ ████████████████████████████████ and found the below posting from ███████████████ which CS-1 confirmed was the posting that ███████████ directed him/her to draft shortly before he indicated that the real reason he was opposing the project was to get back at the Project developers for "tying up" ████████ money:



53.     As set out in the ██████████ image above, when ████████████ formally

announced his opposition to the Project in ████████████ he stated that he wanted

████████████████████████████████████████████████

████████████████████████████████ but did not provide further

details. Based on my review of City of Chicago records and discussions with

individuals with knowledge at the City OIG's office, I know that the ████████

████████████████████████ was an economic development strategy report

that the City of Chicago's Department of Housing and Economic Development

(DHED) hired a private consulting company to complete in ████ to explore ways to

revitalize economic activity ████████████ [16]

54. The ████████████████████████ envisioned a

smaller structure on the ████████. Specifically, the plan called for a ████

████████████████

████████████████████████████████████████████

████████formally opposed the Project, it called for a ████████

████████████████ also called for a public

outdoor space behind the Project, and an access road behind the Project to connect

████████████████████ both of which were also included in the

plan that Developers 1 and 2 presented at the ████████████ meeting.

████████████████████████████████████████████

55.     In late ████████████████████████████████████████ made a series of public statements regarding his opposition to the Project that included further details regarding the specific purported reasons why he opposed the Project. For example, on ██████████████████████████████████ published an article that included an interview with ████████ regarding his reasons for opposing the Project.[17] According to the article,

████████████████████████████████████████████████████████████

56.     Further, on or about ████████████████████████ gave a recorded television interview to WGN TV (a recording of which is available on ████████████████ ████████████ During the interview, ████████ stated his initial concerns with the Project ██████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████



57. On the morning of the ▮▮▮▮▮▮▮▮ television interview regarding ▮▮▮▮▮▮▮▮▮▮ opposition to the Project—which appears to be the only television interview he gave—▮▮▮▮▮▮▮▮▮▮▮▮ exchanged approximately 6 text messages, which was the first phone contact they had had since September 23, 2019. In total, ▮▮▮▮▮▮▮▮▮▮▮ exchanged approximately 42 text messages in ▮▮▮▮▮▮▮ the month after ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ October 2019 represents the highest level of monthly phone contact between ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ in the past year (starting August 1, 2019).

58. Based on ▮▮▮▮▮▮ public statements, it appears that ▮▮▮▮▮▮▮ primary publicly stated reasons for ultimately opposing the Project in ▮▮ was the

██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████

interview with the ███████████████ (see ¶ 40), ███████ also expressed concerns that the Project's proposed addition of ████████████████ would be insufficient, and that the Project continued to lack ██████████████████████

F. **There is a Reasonable Basis to Believe that ████████████ Public Explanation for Opposing the Project in ███████████████ was Pretextual**

██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
█████████████████ Specifically, based on my review of ████████████████ page, as well as relevant press reporting, on or about ████████████████████ announced that, after ████████████████████████████ █████ ████████████ █████████████████████████████████ that summarized (somewhat misleadingly, as explained below) the changes between

██████████████████████████████████████████████



60.     Based on my review of the specifications for the revised Project plan that
█████████████████████████ nd consistent with the "Fact Sheet" posted

on█████████████████ here were no changes to the ███████████
█████████████████████████████████████████████████████████

████████████████████████████ Further, although the "Fact Sheet"

above states that there were "Zero" ██████████████ in the original plan, in

fact, as explained above, at the time █████████ opposed the Project in ███████

████████ the developers had already agreed to include ████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

61.    On ████████████████████████ held a public meeting to announce the agreement on the revised Project plan that he had reached with Development Companies 1 and 2 (a video of which is available on ████████████████████ Based on my review of the video, at the meeting, in summary, ████████ explained his change in position by saying that he had fought to get other changes to the Project, ████████████████████████ but that Development Companies 1 and 2 had made clear they could not compromise on that point. ████████████ highlighted the changes he was able to secure (set out in the fact sheet above), stated that he had determined it was the best deal he could get, and had concluded that the revised Project was better than no Project.

62.    According to City of Chicago records and press reporting, on ████████ ████████ he Chicago City Council approved the Project at the ████████████ (the prior day, ████████████, the Zoning Committee approved the necessary zoning ordinance). ████████████ voted in favor of the Project at the ████████████ vote.

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

64. In summary, based on: (1) ████████ history of illegal aldermanic campaign contributions (¶ 16); (2) CS-1's information that in May 2019, ████ made a $5,000 cash payment to ████████████████ nstructed CS-1 to conceal (¶ 25-30); (3) the independent evidence that corroborates that ████ in fact made the $5,000 payment to ████████ including the spike in telephone contacts between ████████████████ in May 2019 (¶ 34), and the bank records showing that Individuals A and B made a $5,000 cash deposit at or near the time that CS-1 states that ████████ gave Individuals A and B the $5,000 he received from ████ (¶ 35); (4) the independent evidence that corroborates that ████████ n fact concealed the $5,000 payment (including the absence of ████████████████ reflecting money received from ████ in 2019, and the lack of records accounting for how ████████████████████ n the summer of 2019(¶ 32); and (5) the evidence showing that ████████ initial opposition to the Project was tied to ████ including (i) ████ May 2019 statement to ████████ and CS-1 that he wanted the Project stopped just days before ████ made the $5,000 payment to ████████ (¶ 22); (ii) ████████ text message communications to

40

CS-1 on August 29, 2019 ("Well, well, well" and "It's on" in connection with a voicemail left from Developer 2 to ████ regarding the Project) (¶¶ 38-41); and (iii) ████████ statement to CS-1 shortly after ████ decided to formally oppose the Project, "[Developer 1] likes tying up ██ money, let's see how he likes it done to him (¶ 51)), I submit there is probable cause to believe that in May 2019, ████ corruptly gave and ████████ corruptly accepted a $5,000 cash payment in exchange for ████████████████████████████████████ ████████████████████████████████████████████ ████████████████████ in violation of Title 18, United States Code, Sections 666(a)(1)(B) and 666(a)(2), and conspiracy to commit those offenses, in violation of Title 18, United States Code, Section 371.

## PROBABLE CAUSE TO BELIEVE EVIDENCE WILL BE LOCATED IN THE SUBJECT ACCOUNT

65.    According to Apple Inc. business records, the **Subject Account** is an Apple account associated both with ████ and telephone number (773) ████. According to Apple records, the **Subject Account** was created on or about October 12, 2012 and was active as of May 2020. The setting for the account was listed as "full iCloud." Under the "full iCloud" setting, all data capable of being stored on iCloud, including all text messages sent and received over the (773) ████ device, as well as all GPS locational data for the telephone assigned number (773) ████ are automatically stored to the **Subject Account**.

## SEARCH PROCEDURE

66.    In order to facilitate seizure by law enforcement of the records and information described in Attachment A, this affidavit and application for search warrant seek authorization, pursuant to 18 U.S.C. §§ 2703(a), 2703(b)(1)(A)and 2703(c)(1)(A), to permit employees of Apple to assist agents in the execution of this warrant. In executing this warrant the following procedures will be implemented:

- The search warrant will be presented to Apple personnel who will be directed to the information described in Section II of Attachment A.

- In order to minimize any disruption of computer service to innocent third parties, Apple employees and/or law enforcement personnel trained in the operation of computers will create an exact duplicate of the information described in Section II of Attachment A.

- Apple employees will provide the exact duplicate in electronic form of the information described in Section II of Attachment A and all information stored in those accounts and files to the agent who serves this search warrant.

- Following the protocol set out in the Addendum to Attachment A, law enforcement personnel will there after review all information and records received from Apple employees to locate the information to be seized by law enforcement personnel pursuant to Section III of Attachment A.

## CONCLUSION

67.    Based on the above information, I respectfully submit that there is

probable cause to believe that evidence of violations of the **Subject Offense** will be found in the **Subject Account**. By this affidavit and application, I request that the Court issue a search warrant directed to Apple allowing agents to seize the electronic evidence and other information store on the Apple servers following the search procedure described in Attachment A, as well as the Addendum.

FURTHER AFFIANT SAYETH NOT.

Gregory B. Linder
Special Agent
Federal Bureau of Investigation

Subscribed and sworn
before me this 24th day of July, 2020

Honorable JEFFRREY I. CUMMINGS
United States Magistrate Judge

## ATTACHMENT A

I. **SEARCH PROCEDURE**

    1.    The search warrant will be presented to Apple, Inc. personnel, who will be directed to isolate those accounts and files described in Section II below.

    2.    In order to minimize any disruption of computer service to innocent third parties, company employees and/or law enforcement personnel trained in the operation of computers will create an exact duplicate of the computer accounts and files described in Section II below, including an exact duplicate of all information stored in the computer accounts and files described therein.

    3.    Apple, Inc. employees will provide the exact duplicate in electronic form of the accounts and files described in Section II below and all information stored in those accounts and files to the agent who serves the search warrant.

    4.    Following the protocol set out in the Addendum to this Attachment, law enforcement personnel will thereafter review information and records received from company employees to locate the information to be seized by law enforcement personnel specified in Section III below.

II. **FILES AND ACCOUNTS TO BE COPIED BY EMPLOYEES OF APPLE, INC.**

    a.    All text messages (including iMessage, SMS, and MMS) sent or received between February 2019 and the present stored and presently contained in, or on behalf of the AppleID account associated with,        **bcglobal.net, and the associated DS ID**      which are stored at premises owned, maintained,

controlled, or operated by Apple, Inc., One Infinite Loop, Cupertino, California 95014.

      b.     All stored Apple device location data **from May 2019 only** including but not limited to GPS coordinates, stored online via iCloud, stored and presently contained in, or on behalf of the AppleID account associated with the iCloud email account address described above in Section II(a).

## III. Information to be Seized by Law Enforcement Personnel

      a.     All information described above in Section II that constitutes evidence concerning violations of the **Subject Offense**, as follows:

      1.     Communications with ▮▮▮▮▮▮ related to the Project, official acts taken or caused by ▮▮▮▮▮▮ related to the Project, Development Company 1, Development Company 2, Developer 1, Developer 2, Alderman 1, payments from ▮▮▮▮▮▮▮▮▮▮ and/or meetings between ▮▮▮▮▮▮▮▮▮▮

      2.     Items related to the Project.

      3.     Items related to Development Companies 1 and 2, and/or Developers 1 and 2;

      4.     Items related to ▮▮▮▮▮▮ physical presence at ▮▮▮▮▮▮▮▮▮▮ in May 2019.

      5.     Items related to the identity of the user or users of the **Subject Account**.

# ADDENDUM TO ATTACHMENT A

With respect to the search of any information and records received from the free web-based electronic mail service provider, law enforcement personnel will locate the information to be seized pursuant to Section III of Attachment A according to the following protocol.

The search procedure may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein):

      a.    searching for and attempting to recover any hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth herein.

      b.    surveying various file directories and the electronic mail, including attachments thereto to determine whether they include data falling within the list of items to be seized as set forth herein.

      c.    opening or reading portions of electronic mail, and attachments thereto, in order to determine whether their contents fall within the items to be seized as set forth herein, and/or

      d.    performing key word searches through all electronic mail and attachments thereto, to determine whether occurrences of language contained in such electronic mail, and attachments thereto, exist that are likely to appear in the

3

information to be seized described in Section III of Attachment A.

Law enforcement personnel are not authorized to conduct additional searches on any information beyond the scope of the items to be seized by this warrant.